2004-NMCA-100

98 P.3d 727

### STATE of New Mexico, Plaintiff–Appellee,

v.

### Ignacio MIRELES, Defendant–Appellant.

### No. 23,450.

Court of Appeals of New Mexico.

June 17, 2004.

338

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, for Appellee.

John B. Bigelow, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

FRY, Judge.

{1} Defendant appeals his convictions for second degree murder (firearm enhancement) and shooting from a motor vehicle (great bodily harm). Defendant argues that: (1) the trial court violated his Fifth Amendment right against self-incrimination in ordering him to submit to a psychological evaluation; (2) the trial court erred in allowing the State to cross-examine Defendant's expert witness with portions of Defendant's otherwise inadmissible custodial statement; (3) his sentences for second degree murder and shooting from a motor vehicle violate his right to be free from double jeopardy; (4) the jury should have determined that Defendant was not guilty by reason of insanity or guilty but mentally ill; (5) there is insufficient evidence to support Defendant's conviction for shooting from a motor vehicle; and, (6) the trial court abused its discretion by not ordering a sixty-day diagnostic evaluation

pursuant to NMSA 1978, § 31–20–3(C) (1985). We affirm.

## BACKGROUND

{2} In May 2000, Defendant and three friends—J.J. Royal, Corey Hamilton, and Anthony Guevara—drove to a convenience store. Royal was driving and Hamilton was in the front passenger seat. Defendant and Guevara were seated in the back seat. Guevara testified that Hamilton went inside the store to purchase cigarettes, and that Royal got out of the car to talk to Victim who was using a payphone outside the store. Defendant and Guevara remained in the car.

{3} Guevara, Hamilton, and Royal subsequently witnessed Defendant shoot Victim. Guevara testified that Royal and Victim approached the car together. Guevara believed that the parties were going to give Victim a ride. Guevara saw Victim open the car's back door at which time Defendant, who was still inside the car, shot Victim. Guevara testified that Victim fell to the ground and attempted to "take off running." Guevara further testified that he thought Defendant stepped out of the car and may have fired the weapon.

{4} Hamilton testified that after getting cigarettes from the store and getting back into the car, he saw Defendant shoot Victim when Victim opened the car's back door. Hamilton observed Victim fall backwards toward the ground and then take off running. Hamilton testified that he heard between three and five shots fired, and that Defendant had one leg in the car when he shot Victim.

{5} Royal testified that he had offered Victim a ride in the car to smoke marijuana. After Royal got back into the car, he saw Defendant shoot Victim three or four times from inside the car. Royal testified that Victim fell and then got up and ran, and that Defendant got out of the car and shot Victim again while he was on the ground.

{6} Witnesses from an apartment building across the street from the store also saw the shooting. Zarena Maryboy testified that she lived on the second floor of the apartment building opposite the convenience store. Maryboy stated that, after hearing a gun-shot, she looked out her apartment window and saw Victim lean into a car, and then get out of the car and run to the back of the store. She believed a man in the car's back seat shot Victim from inside the car. Maryboy testified that when Victim ran to the back of the store, Defendant ran after Victim and shot him again. Maryboy indicated that three or four shots were fired, and that the shooter jumped head first back into the car after the shooting.

{7} Another witness from the apartment building, Scott Mooreman, saw Victim lean into the car and, after hearing a shot, saw Victim grab himself around the face. Mooreman testified that Victim tried to run away, but that the shooter pursued Victim and shot him in the back while Victim was running and then shot Victim again after Victim fell to the ground.

{8} Royal testified that following the shooting, he put the car in reverse and started to drive off, at which time Defendant—who had gotten out of the car to pursue Victim—jumped back into the car's back seat. Royal then drove to a friend's house.

{9} Several days later, officers apprehended and arrested Defendant. Defendant gave officers a post-arrest, custodial statement, which the trial court ultimately suppressed on the basis that, although voluntary, the statement was made in violation of Defendant's *Miranda* rights.

{10} At trial, defense witness Robert Colby, a psychotherapist and psychological evaluator, on direct examination referred to and relied upon portions of Defendant's post-arrest, custodial statement to support his opinion that Defendant was insane at the time of the shooting. The trial court then allowed the State to refer to other portions of the custodial statement to cross-examine Colby. In addition, the State presented the testimony of Dr. Dan Seagrave, a forensic psychologist, who opined that Defendant's actions resulted from taking the drug ecstasy. We discuss the remaining facts more fully in conjunction with the issues.

## DISCUSSION

### Compelled Psychological Examination on the Issue of Defendant's Sanity

{11} Defendant contends that the trial court erred in ordering him to submit to

a psychological examination pursuant to the State's request. Prior to trial, Defendant notified the trial court and the State that he planned to present an insanity defense. In support of his defense, Defendant intended to rely on the results of a psychological examination conducted by Colby. In response, the State requested that Defendant submit to a forensic examination by its chosen expert, Seagrave. The trial court responded to the request by giving Defendant a choice: if Defendant wanted to present his own expert testimony on the issue of his sanity, then he was required to submit to the evaluation requested by the State; Defendant could decline to be evaluated by Seagrave, but if he did so, the trial court would not permit him to present Colby's testimony. Defendant objected to the court-ordered evaluation on the ground that it violated his privilege against self-incrimination contrary to Article 2, Section 15 of the New Mexico Constitution and the Fifth Amendment of the United States Constitution. Although Defendant submitted to the evaluation by Seagrave, at trial he maintained his objections to the testimony resulting from the compelled examination.

■ {12} This case presents a matter of first impression in New Mexico: whether a compelled psychological examination violates the Fifth Amendment rights of a criminal defendant who raises insanity as an affirmative defense, and who intends to present expert testimony as to his sanity at trial. Because this is a constitutional question, we apply de novo review. *See State v. Attaway*, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994).

{13} Preliminarily, we clarify that although Defendant argues that the compelled examination violated his rights, Defendant does not contend that Seagrave's testimony conveyed any particular inculpatory statements to the jury. In other words, Defendant's Fifth Amendment claim of error pertains solely to Seagrave's testimony as it relates to the issue of sanity. Accordingly, this case does not require us to address the connected but distinct question of whether information obtained during a compelled psychological examination may be introduced for the purpose of proving whether a defendant committed the charged criminal acts. *See*

Rule 5–602(E) NMRA 2004 (prohibiting the admission of statements made by a person during a mental examination on issues other than sanity, ability to form specific intent, or competency to stand trial); *see also United States v. Byers*, 740 F.2d 1104, 1111 n. 8 (D.C.Cir.1984) ("Where testimony ... is introduced not on the defendant's sanity but to prove that he committed the criminal act in question, of course a different issue is presented."); *United States v. Madrid*, 673 F.2d 1114, 1120–21 (10th Cir.1982) (analyzing the federal rule of criminal procedure that prohibits the admission of statements made by a defendant on the issue of guilt during a court-ordered psychological examination); *People v. Tally*, 7 P.3d 172, 182 (Colo.Ct.App. 1999) (recognizing the distinction between admitting a statement to prove guilt and admitting a statement to prove sanity); *see generally* 1 Wayne R. LaFave, *Substantive Criminal Law* § 8.2(c) (2d ed. 2003) ("There is general agreement that the [Fifth Amendment] privilege extends to such admissions [on the issue of the conduct charged], although courts have differed upon the means by which the privilege is to be enforced."). We further clarify that this case does not require us to address Defendant's Sixth Amendment rights. Although Defendant requested and was denied the presence of counsel at his court-ordered examination, on appeal he makes no argument that the compelled examination violated his right to counsel. *See Powell v. Texas*, 492 U.S. 680, 684–85, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (emphasizing the importance of the distinction between Fifth Amendment claims and Sixth Amendment claims regarding compelled psychological examinations).

{14} On the narrow issue presented by Defendant, we affirm the trial court. Numerous other jurisdictions have reached the same conclusion, although they do not all rely on the same reasons, and in some cases the analysis depends on statutes not present here. *See* 1 LaFave, *supra*, § 8.2(c) (discussing the competing theories underlying the conclusion that where a defendant raises an insanity defense, a psychiatric examination is not a per se violation of the right against self-incrimination); *see also Byers*, 740 F.2d at 1111 (recognizing that "virtually

all other circuits" have found that a court-ordered examination does not violate the privilege against self-incrimination where the defendant raises an insanity defense); *State v. Martin,* 950 S.W.2d 20, 24 (Tenn.1997) (pointing out that "[v]irtually every federal and state court jurisdiction" has found no violation of the Fifth Amendment in the use of evidence from a court-ordered psychological examination that is requested to rebut the defendant's claim of insanity). As discussed below, we adopt the reasoning that it would be unfair to deny the State a psychological examination conducted by its own expert in a situation like this one, where Defendant raises the insanity defense, which is supported by his own expert witness, and where the State cannot prevail unless it proves Defendant is sane.

{15}   We find general guidance in United States Supreme Court decisions arising in the context of capital sentencing. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the trial court sua sponte ordered the defendant to undergo a competency examination. *Id.* at 465, 101 S.Ct. 1866. Unlike this case, however, the defendant had raised no issues regarding his mental status. *Id.* at 466, 101 S.Ct. 1866. Then, at sentencing, the state introduced evidence obtained during the competency examination for the purpose of enhancing defendant's sentence. *Id.* Under these circumstances, the compelled examination plainly violated the defendant's right not to incriminate himself because the defendant did not voluntarily consent to the examination after being informed of his right to remain silent, and he did not know that his disclosures might be used against him. *Id.* at 468, 101 S.Ct. 1866. In so holding, the United States Supreme Court acknowledged the distinction between such a case and one like Defendant's, observing that "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case." *Id.* at 465, 101 S.Ct. 1866.

{16}   Subsequent to *Estelle,* in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the United States Supreme Court confronted the difficulty presented when the defendant initiates a psychological examination in order to prove a mental-status defense. The Court concluded that the prosecution may use those examination results during capital sentencing. *Id.* at 423–24, 107 S.Ct. 2906. *Buchanan* is different from the case at hand because the disputed evidence resulted from an examination that the defendant requested, *id.* at 422–23, 107 S.Ct. 2906, whereas in this case the disputed examination was court-ordered at the State's request. Nonetheless, these cases illuminate the important distinction between a psychological examination that is initiated entirely at the behest of the trial court or the State, and an examination that is imposed in order to rebut claims made by a defendant. Defendant's case falls squarely in the latter category.

{17}   In concluding that the compelled examination did not violate Defendant's rights, we also rely on general notions of fairness, which we consider in light of the fact that the State had to prove beyond a reasonable doubt that Defendant was sane. *See* UJI 14–5101 NMRA 2004. This would seem to put the State at a significant and unfair disadvantage if it could not muster its own evidence on the issue of sanity. "Such practical considerations of what constitutes a fair but effective criminal process are rightly taken into account in determining the reach of the Fifth Amendment privilege against self incrimination." *See* 1 LaFave, *supra,* § 8.2(c). We find persuasive the rationale that notions of a "fair state-individual balance" and "judicial common sense" permit a court-ordered psychological examination under these facts. *See Byers,* 740 F.2d at 1111–13 (analyzing various justifications and concluding that courts "have denied the Fifth Amendment claim primarily because of the unreasonable and debilitating effect it would have upon society's conduct of a fair inquiry into the defendant's culpability").

{18}   Finally, with respect to the parties' dispute about whether the trial court has authority to order a psychological examination in the first instance, although it is true that there is no specific statutory authoriza-

tion for a compelled examination, we agree with the trial court that it had the inherent authority to order the examination in order to ensure fairness in the judicial process. *See In re Jade G.*, 2001–NMCA–058, ¶ 27, 130 N.M. 687, 30 P.3d 376 ("[E]ven though specific judicial authority is not delineated by statute, or stated in a rule of court, a court may exercise authority that is essential to the court's fulfilling its judicial functions."). Indeed, within constitutional limits, "[t]he basic purpose of a trial is the determination of truth." *State v. Gonzales*, 1996–NMCA–026, ¶ 13, 121 N.M. 421, 912 P.2d 297 (internal quotation marks and citation omitted). Here, in order to determine whether Defendant was insane at the time of the shooting, the fact finder necessarily had to rely on expert testimony; the trial court's order provided the jury with two expert viewpoints and facilitated the truth-seeking process.

### Use of Defendant's Non–Mirandized, Custodial Statement in Cross–Examination of Defendant's Expert Witness

█ {19} Defendant argues that the trial court erred in allowing the State to cross-examine his expert witness, Colby, with portions of Defendant's otherwise inadmissible custodial statement. Specifically, Defendant argues that the admission of portions of the custodial statement contravenes *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990), in which the United States Supreme Court refused to expand the impeachment exception to the exclusionary rule to witnesses other than a testifying defendant. *Id.* at 320, 110 S.Ct. 648. The State counters that Defendant agreed that the expert could be cross-examined on anything relied upon by Colby to form his opinion, including the statement. The State further argues that even if Defendant had not agreed as much, the cross-examination of Colby constituted testing of the basis of expert opinion as expressly permitted by Rule 11–705 NMRA 2004. We agree with the State that because Defendant explicitly agreed to the admission of the custodial statement as it pertained to Colby's expert opinion, Defendant waived this issue on appeal.

{20} Defendant made the custodial statement to police when they arrested him three days after the shooting. The trial court subsequently granted Defendant's motion to suppress the statement. Although the trial court rejected Defendant's argument that the statement was involuntarily made, the trial court found the custodial statement inadmissible because Defendant had not waived his *Miranda* rights. Thus, Defendant succeeded in preventing the admission of the custodial statement in its entirety. However, Defendant agreed that if Colby relied on the custodial statement for his opinion that Defendant was insane, then the State could rely on portions of the statement to cross-examine Colby. As discussed below, the testimony at trial was consistent with this concession by Defendant.

{21} On direct examination, Colby testified that, in his opinion, Defendant was legally insane. In support of his opinion, Colby indicated that he relied in part on statements that Defendant made to police. Specifically, Colby related portions of Defendant's custodial statement where Defendant said that he perceived himself to be a soldier of God; that God had told him to commit the crime; that he perceived himself to be the anti-Christ or the devil; that Victim was a demon and Defendant acted to protect his friends; and that his actions were somehow related to shooting dice and to having an ability to predict the future.

{22} On cross-examination, the trial court permitted the State to question Colby with specific references to different portions of the custodial statement in which Defendant suggested that he was motivated by a plan to rob Victim and take his life, and that he knew his actions were wrong. The State asked Colby why his psychological evaluation did not focus on the statements about robbing the victim. Thus, the State's line of questioning sought to establish that Defendant's actions stemmed not from insanity, as indicated by Colby, but from a plan to take Victim's gold jewelry. Defendant did not object to this line of questioning, likely because he had previously agreed that the State could question Colby about the custodi-

al statement because it formed part of the basis of his expert opinion.

{23} The contents of the custodial statement arose once again during testimony by the State's expert witness, Seagrave, with respect to the issue of whether ingestion of the drug ecstasy caused Defendant to be psychotic at the time of the crime. On direct examination Seagrave had opined that ecstasy had induced Defendant's psychotic mental state. In response, on cross-examination, Defendant used portions of the custodial statement in an effort to attribute Defendant's behavior to a continuing psychosis unrelated to ecstasy.

{24} In summary, Defendant's expert witness relied on the custodial statement in forming his opinion; without objecting, Defendant therefore conceded that the State could cross-examine Colby with the custodial statement; Defendant did not object when the State proceeded with the cross-examination as previously agreed; and Defendant relied on portions of the statement in cross-examining the State's expert witness. We therefore conclude that Defendant waived this issue for purposes of appeal. *See State v. Gilbert*, 98 N.M. 77, 84, 644 P.2d 1066, 1073 (Ct.App.1982) ("Defendant may not predicate error on his own conduct."); *see also State v. Gutierrez*, 91 N.M. 54, 55, 570 P.2d 592, 593 (1977) ("This Court will not consider an objection by the appellant raised for the first time in his brief in chief.").

### Double Jeopardy

{25} Defendant argues that he could not have committed second degree murder without also committing shooting from a motor vehicle. According to Defendant, therefore, the trial court violated his right to be free from double jeopardy by sentencing him on his convictions for both crimes. *See* U.S. Const. amends. V, XIV; N.M. Const. art. II, § 15. The State contends that there was no double jeopardy violation because the testimony at trial permitted the inference that each conviction was based on distinct conduct and because the two statutes evince legislative intent to impose separate punishments for each crime. We agree with the State.

{26} The double jeopardy clause protects against multiple punishment for the same offense. *See Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991). We apply a two-part inquiry to address Defendant's claim of impermissible multiple punishment under two separate statutes. *Id.* at 13, 810 P.2d at 1233. First, we consider whether the conduct underlying the offenses is unitary. *Id.* If the conduct is separate and distinct, no double jeopardy violation has occurred and the inquiry is at an end. *Id.* at 14, 810 P.2d at 1234. If, however, the conduct is unitary, we next address whether the legislature intended multiple punishments for unitary conduct. *Id.* If the legislature did not intend to create separately punishable offenses, the double jeopardy clause will prohibit punishment for both offenses. *Id.*

{27} Defendant argues that his convictions for second degree murder and shooting at or from a motor vehicle involve unitary conduct because the shots were fired at the same time and thus were not separated by either time or space. Contrary to Defendant's assertions, however, evidence was presented that Defendant, while inside the car, shot Victim three or four times and then got out of the car and shot Victim again. Specifically, witness Royal testified that Defendant shot Victim three or four times when Victim approached and opened the door of the car in which Defendant was seated. Royal testified further that when Victim fell and then got up and began to run away, Defendant got out of the car and shot Victim again. Another witness, Maryboy, testified that she was inside an apartment across the street from the store when she heard three or four shots, looked out the window, and saw Victim leaning inside a car. Maryboy then saw Victim run behind the store and a person in the backseat of the car get out of the car, chase after Victim, and then shoot Victim again when Victim fell down.

{28} The foregoing evidence supports a jury determination that the conduct underlying the crimes was not unitary, but was instead separated by both time and distance because, in between shots, Victim ran and Defendant got out of the car to pursue and

shoot Victim again. *See, e.g., State v. Cooper*, 1997–NMSC–058, ¶ 59, 124 N.M. 277, 949 P.2d 660 (holding that "indicia of distinctness include the separation between the illegal acts by either time or physical distance, the quality and nature of the individual acts, and the objectives and results of each act" (internal quotation marks and citation omitted)); *see also Swafford*, 112 N.M. at 14, 810 P.2d at 1234 (holding that "similar statutory provisions sharing certain elements may support separate convictions and punishments where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses").

■ {29} Even if the conduct were unitary, however, we would affirm on the basis that the legislature intended to provide multiple punishments for the offenses of second degree murder and shooting into or from a vehicle. *See, e.g., State v. Gonzales*, 113 N.M. 221, 225, 824 P.2d 1023, 1027 (1992) (holding that the legislature intended separate punishments for unitary conduct that violates both the first-degree murder statute and the statute proscribing shooting from or into an occupied motor vehicle). First, because each statute requires proof of an element that the other statute does not require, we begin with a presumption that the legislature intended to punish the offenses separately. *See Swafford*, 112 N.M. at 14, 810 P.2d at 1234. Specifically, second degree murder requires that the defendant know that his actions create a strong probability of death or great bodily harm, an element that is not required for shooting from a motor vehicle. *See* NMSA 1978, § 30–2–1(B) (1994); UJI 14–211 NMRA 2004. Conversely, shooting from a motor vehicle requires that the acts be done while in a motor vehicle but does not require the same mens rea as for second degree murder. *See* NMSA 1978, § 30–3–8(B) (1993); UJI 14–344 NMRA 2004; *cf. State v. Varela*, 1999–NMSC–045, ¶ 18, 128 N.M. 454, 993 P.2d 1280 (holding the crime of shooting at a dwelling is not a lesser included offense of second degree murder because each crime requires a different mens rea).

{30} Second, a consideration of each crime shows that the statutes are designed to combat distinct evils, which provides further indicia of legislative intent confirming the presumption that the offenses are separately punishable. Specifically, the second degree murder statute is designed to discourage and punish the unlawful killing of people, whereas the shooting at or from a motor vehicle statute is designed to protect the public from property damage and personal injury caused by gunfire from a motor vehicle, such as in a drive-by shooting. *See, e.g., Gonzales*, 113 N.M. at 225, 824 P.2d at 1027; *see also State v. Elmquist*, 114 N.M. 551, 553, 844 P.2d 131, 133 (Ct.App.1992) (recognizing that in enacting Section 30–3–8, the legislature was concerned with conduct designed to terrorize or intimidate). We therefore conclude that the legislature intended separate punishments for each crime.

**Sufficiency of Evidence in Support of the Conviction for Second Degree Murder**

■ {31} Defendant argues that he should have been found either not guilty by reason of insanity or, alternatively, guilty but mentally ill. According to Defendant, there was overwhelming evidence that he suffered from various mental disorders and, in contrast, there was insufficient evidence to support a guilty verdict. To address Defendant's claim, we consider the evidence in the light most favorable to the verdict, and we determine whether a rational trier of fact could have found that the State established the elements of second degree murder beyond a reasonable doubt. *See State v. Coffin*, 1999–NMSC–038, ¶ 73, 128 N.M. 192, 991 P.2d 477.

■ {32} A jury finding of insanity is proper when, at the time of a crime's commission, because of a specific and longstanding mental disease, a defendant did not know what he was doing or understand the consequences of his act; or did not know that his act was wrong; or could not prevent himself from committing the act. *See* UJI 14–5101. A jury finding of guilty but mentally ill is appropriate when, at the time of the crime's commission, a substantial disorder of thought, mood, or behavior impaired the de-

fendant's judgment but did not amount to insanity as described above. *See id.; see also State v. Neely,* 112 N.M. 702, 707, 819 P.2d 249, 254 (1991) (distinguishing between a jury verdict of insane versus a verdict of guilty but mentally ill).

{33} Defendant's expert witness, Colby, testified that at the time of the shooting, Defendant was suffering from both visual hallucinations and thought delusions. Based on those symptoms as well as a report from when Defendant was confined at a juvenile detention facility, Colby diagnosed an acute psychotic episode. Considering the psychotic episode in combination with Defendant's documented history of mental disturbances, Colby testified that, in his opinion, Defendant was legally insane at the time of the shooting.

{34} In response to Colby's testimony, the State presented testimony by its own expert witness, Seagrave, who opined that Defendant did not suffer from a longstanding mental disease as required for insanity, but instead that Defendant's voluntary use of the drug ecstasy caused a drug-induced psychosis, bizarre delusional beliefs, and misinterpretation of reality such that Defendant believed that he had to shoot Victim in order to protect himself and his friend, Royal. Further supporting the State's theory of a drug-induced psychosis, witnesses Guevara and Hamilton testified that prior to the shooting, Defendant had been taking ecstasy for several days and had been acting "crazy in the head." Guevara testified that Defendant had not acted that way before he took ecstasy.

{35} A review of both experts' testimony indicates that both believed Defendant to be psychotic at the time of the crime, with Colby opining that the psychosis resulted from pre-existing, serious psychological diagnoses and Seagrave opining that the psychosis resulted from an ecstasy-induced psychosis. Thus, the evidence from both experts may have supported a verdict of guilty but mentally ill. *See id.* It was the fact-finder's prerogative, however, to reject the testimony of both experts and determine that Defendant was neither legally insane nor mentally ill. *See, e.g., State v. Jason F.,* 1998–NMSC–010, ¶ 29, 125 N.M. 111, 957 P.2d 1145 (explaining that in the context of a fact-finder's rejection of expert testimony on the issue of competency, recognizing that while expert opinion may be compelling, expert testimony is opinion, not fact); *see also State v. Alberico,* 116 N.M. 156, 164, 861 P.2d 192, 200 (1993) (recognizing that a jury does not have to accept an expert's opinion as conclusive even though opinion may be uncontroverted); *State v. James,* 85 N.M. 230, 232, 511 P.2d 556, 558 (Ct.App.1973) (holding that a jury, in determining whether or not a defendant is insane, is not required to accept expert opinion).

{36} In rejecting the view that Defendant was insane or mentally ill, the jury may have been influenced by Seagrave's testimony that Defendant's responses to a psychological test indicated that Defendant was trying to exaggerate or fabricate psychological problems. In addition, both Colby and Seagrave testified that jail staff who monitored Defendant reported concerns that he might be "malingering," that is, exaggerating his symptoms of mental illness. Similarly, the jury may have been influenced by evidence suggesting that Defendant's encounter with Victim arose out of a plan to rob Victim. Viewing this evidence in the light most favorable to the verdict and making all reasonable inferences in support of the verdict, this provides sufficient evidence for the jury to find Defendant guilty of second degree murder. *See Coffin,* 1999–NMSC–038, ¶ 73, 128 N.M. 192, 991 P.2d 477.

### Sufficiency of Evidence for Conviction for Shooting from a Motor Vehicle

{37} Defendant argues that irrespective of the jury's rejection of his insanity defense, his conviction for shooting from a motor vehicle is not supported by substantial evidence. Defendant concedes, however, that evidence was presented that Defendant, while seated in the car, shot Victim. This evidence is sufficient to support Defendant's conviction, which requires proof that the defendant willfully discharged a firearm from a motor vehicle with reckless disregard for another. § 30–3–8(B); *see, e.g., State v. Garcia,* 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (stating that substantial evidence exists if any rational jury could have found each

element of the crime to be established beyond a reasonable doubt).

{38} We reject Defendant's argument that his actions were not "reckless" because he shot directly at Victim. "Reckless disregard" requires that Defendant's conduct created a substantial and foreseeable risk and that Defendant disregarded such risk and was wholly indifferent to the consequences of his conduct and the welfare and safety of others. *See* UJI 14–344; UJI 14–1704 NMRA 2004; *Elmquist,* 114 N.M. at 553, 844 P.2d at 133 (recognizing that the crime shooting into an occupied vehicle requires recklessness and the total disregard for others). Defendant's act of shooting directly at Victim satisfies this definition. That Defendant accurately shot Victim does not negate that his conduct was reckless. If anything, his accuracy reflected an increased substantial and foreseeable risk.

{39} In conjunction with his sufficiency of the evidence issue, Defendant argues also that the "[l]egislature could not have intended that this statute [§ 30–3–8(B) ] apply to the situation where the motor vehicle is the mere locus of the crime, not the means by which the crime is committed" or, put another way, that Section 30–3–8(B) is intended to apply to drive-by shootings rather than a situation such as the present involving a vehicle that was not moving. Because there is no indication that Defendant raised this argument below, we review Defendant's conviction for fundamental error based on his contention that his actions do not constitute the elements of this crime as a matter of law. *See State v. Cearley,* 2004-NMCA-079, ¶ 9, 135 N.M. 710, 92 P.3d 1284 (N.M.Ct.App. 2004). We are unpersuaded by Defendant's contention because the unambiguous language of the statute does not require that the vehicle be in motion. *See State v. Jonathan M.,* 109 N.M. 789, 790, 791 P.2d 64, 65 (1990) ("When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation."); *State v. Elliott,* 89 N.M. 756, 757, 557 P.2d 1105, 1106 (1977) ("Statutes are to be given effect as written and, where free from ambiguity, there is no room for construction.").

**Trial Court's Refusal to Order a Sixty–Day Evaluation**

{40} Defendant argues that the trial court erred in not ordering a sixty-day evaluation for Defendant pursuant to Section 31–20–3(C). We review the trial court's sentencing determination for an abuse of discretion. *See State v. Cawley,* 110 N.M. 705, 712, 799 P.2d 574, 581 (1990).

{41} Upon entry of a judgment of conviction, the court has four basic options: (1) sentence the defendant, executing the sentence by committing him to jail or prison, NMSA 1978, Section 31–20–2 [ (1993) ]; (2) defer imposition of sentence, Section 31–20–3(A); (3) sentence the defendant and suspend in whole or in part execution of the sentence, Section 31–20–3(B); or (4) commit the defendant to a period of diagnosis prior to sentencing, Section 31–20–3(C). *State v. Clah,* 1997–NMCA–091, ¶ 19, 124 N.M. 6, 946 P.2d 210. As we stated in *State v. Sinyard,* "[r]ead in their entirety, the sentencing statutes evidence a legislative intent that the trial court have a wide variety of options by which to sentence," 100 N.M. 694, 697, 675 P.2d 426, 429 (Ct.App.1983), and the trial court has broad discretion in determining whether or not to order a diagnostic evaluation for a defendant. *Id.*

{42} In the present case, the State argued that a sixty-day evaluation was not necessary because the trial court had before it evidence of nine years of psychological evaluations, as well as the testimony of two mental health experts. We hold that it was within the court's discretion, based on the information before it, to conclude that a diagnostic evaluation was not merited.

**CONCLUSION**

{43} Based on the foregoing discussion, we affirm.

{44} **IT IS SO ORDERED.**

JONATHAN B. SUTIN and IRA ROBINSON, JJ., concur.