This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **No. A-1-CA-34359**

**JOHN MAYES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**William C. Birdsall, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jane A. Bernstein, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VARGAS, Judge.**

{1} A jury convicted Defendant John Mayes of second degree murder, aggravated burglary, tampering with evidence, unlawful taking of a motor vehicle, fraudulent use of a credit card, and attempted residential burglary in connection with the beating death of Dr. James Nordstrom. On appeal, Defendant contends that all or parts of his conviction must be overturned for three separate reasons. First, Defendant contends that the jury deliberations were tainted and the verdict was in error because the district court coerced the jury to return a guilty verdict on the second degree murder charge and refused to acquit Defendant of murder when it received a completed not-guilty verdict form for voluntary manslaughter, before deliberations were completed on the murder charge. Defendant also argues that his confession should have been suppressed because he did not knowingly, intelligently, and voluntarily waive his constitutional rights. Finally, Defendant claims that the district court erroneously sentenced him as an adult for both delinquency and youthful offender offenses, requiring that the delinquency charges be vacated. Unpersuaded by Defendant's arguments, we affirm his conviction in its entirety.

**BACKGROUND**

{2} On Friday morning, following seven days of trial, the case was submitted to the jury for deliberations. When the jury had not notified the district court of a verdict, by 3:30 that afternoon, seven hours into deliberations, the district court called counsel

2

into court and proposed to inquire whether the jury was deadlocked or whether it felt additional deliberations would be beneficial. Both the State and Defendant objected to the inquiry, reasoning that the length of deliberations was not surprising given the gravity of the charges. Noting that the jury had not asked for assistance regarding a deadlock, the parties argued it was unnecessary for the court to "interfer[e] with the process." The court stated that it felt this had been "quite a long deliberation," and that it expected "counts three and beyond were dealt with in the first hour." Nonetheless, the court agreed to allow deliberations to continue for another hour before making an inquiry into the jury's progress.

{3}    At 4:30 p.m., the district court called the jury back into the court room, and the following exchange took place between the court and foreperson:

Court:       Has the jury reached a verdict as to any of the counts?

Foreperson: To some counts, yes.

Court:       Okay, which counts—without telling me the verdict—tell me which counts please there are verdicts for.

Foreperson: Count 2 and on.

Court:       Counts 2, 3, 4, 5, and 6?

Foreperson: Yes.

Court:       There is not a verdict as to Count 1?

Foreperson: Correct.

3

Court: Is there . . . do you and the jury collectively feel that additional deliberations might be fruitful in resolving or arriving at a unanimous verdict as to Count 1?

Foreperson: I can't say.

Court: Do you believe that there is a reasonable probability that the jury would be able to agree on a unanimous verdict as to Count 1?

Foreperson: I believe there could, but that's my intuition.

Court: . . . Here's the situation ladies and gentlemen . . . we have a little bit of time left today. . . . If you believe that further deliberations could be beneficial—not would be, but could be and I agree that's speculation—we're looking at coming back Monday morning. Will you all be able to come back Monday morning? Anyone who couldn't? Alright then. Then let me inquire at this point—it's 4:30 now—would you rather work a little while longer or call it, come back Monday morning, have a weekend to not think about it, and take another whack at it, say about 8:30 Monday morning?

The foreperson requested that they be given until 5:00 p.m. to deliberate, and the court agreed. The court then stated, "the other thing that we need to do, . . . for the counts that you have arrived at unanimous verdicts, I need to have you complete the forms of verdict, and we'll need to take those verdicts at five o'clock, whether or not we still have more to do on those other counts."

{4}    When the jury returned at 5:00 p.m., the court asked the foreperson, "Do you have the forms of verdict for the ones that you were able to reach a unanimous verdict on?" The foreperson provided the completed forms, and after reviewing those verdict

4

forms, the district court called the parties up to the bench. During a bench conference, the judge revealed the jury had submitted a verdict form finding Defendant not guilty of manslaughter. Defense counsel argued that, by acquitting Defendant of the voluntary manslaughter charge, the jury had thereby acquitted Defendant of the first and second degree murder charges. The court responded that was not necessarily true because the jury had not yet signed the verdict forms for the first and second degree murder charges. After the bench conference, the district court read the verdict forms verbatim in open court; the jury found Defendant guilty of both burglary counts, tampering with evidence, unlawful taking of a motor vehicle, and fraudulent use of a credit card. The district court polled the jury, asking each juror for a yes or no answer as to whether the verdict accurately reflected his or her decision. All jurors answered in the affirmative.

{5}     The court then sought clarification regarding the murder charge:

> I have a count one verdict form that says that you find . . . Defendant not guilty of voluntary manslaughter. I see no verdict forms for second degree murder or first degree murder, and I'm going to inquire so that we'll have that information on the record. Does that mean that in finding . . . Defendant not guilty of voluntary manslaughter, you've also found him not guilty of second degree and first degree murder?

The foreperson responded, "[t]hat is not correct. We're still deliberating." The court stated, "Alright. I'll leave it at that. At this juncture, I'm going to ask that you return Monday morning at 8:30." Outside the presence of the jury, the district court declined

5

to rule on whether jury confusion resulting in an acquittal for a lesser included offense results in an automatic acquittal on the greater offenses but asked the parties to be prepared to address the issue on the following Monday.

{6}    On Monday morning, Defendant filed a demand for entry of judgment of acquittal on the murder count, based on the jury's not guilty verdict on voluntary manslaughter during the Friday evening proceedings. The court explained its position to the parties as follows:

> I fully intend to let the situation play out with the jury as to whether they reach a verdict or indicate that they cannot and that will happen today, one way or the other. . . . If it were just that verdict form in and of itself, I might be a little more inclined to take a quicker action on it. But the fact is, those folks stood up there and told me that they had not reached a verdict on first or second degree murder. What they've done effectively by convicting on count two they've indicated self defense didn't work. By finding not guilty as to the voluntary manslaughter, what they're effect[ively] telling us, in reality, is they don't buy sufficient provocation, coupled with the fact that they're still debating first or second degree murder. Regardless, before I make a call on this issue, and I'm not going to do it today, and I am not going to terminate the jury proceedings. I want this court—and of course the appellate courts—to have as . . . complete a picture as possible as to just how messed up this jury was in its deliberations . . . I'm going to wait until they either hang or come up with a verdict.

Defense counsel requested that there be "no more inquiries or exchanges with the jury . . . and the court during the course of their deliberations." The court responded, "Nope; if I need to bring them in here and inquire as to whether they're hung up or not, I by golly will, and after and if I determine that they are hung, I will certainly poll

6

them as to what their vote is[.]" The court had no further interaction with the jury, however, until it returned after roughly two hours of deliberation on Monday. The jury found Defendant not guilty of first degree murder and voluntary manslaughter, but guilty of second degree murder. The district court polled each member of the jury, each of whom confirmed that verdict accurately reflected his or her decision.

**DISCUSSION**

**Coercion and Acquittal**

{7}    Defendant argues that the district court's unnecessary inquiry into the jury's deliberations improperly coerced the jury to return a guilty verdict for the second degree murder charge. Defendant contends that "the mere fact that the judge questioned the jury's verdict coerced the jury" both by forcing a decision prematurely and by suggesting the answer the court wanted—that acquittal on the lesser included charge was not an acquittal on the greater charges.

{8}    Whether a defendant's right to procedural due process in jury deliberations has been violated is a legal question that we review de novo. *State v. Brothers*, 2002-NMCA-110, ¶ 25, 133 N.M. 36, 59 P.3d 1268; *see State v. McCarter*, 1980-NMSC-003, ¶ 7, 93 N.M. 708, 604 P.2d 1242 (holding that the judge's coercive actions in handling the jury violated the due process guarantee of a fair and impartial trial). A judge instructing a jury once deliberations have begun should give careful

7

consideration to the gravity of crime charged, the nature of the defense, the complexity of the facts, and the amount of time the jurors have been deliberating. *See State v. Horton*, 1953-NMSC-044, ¶ 15, 57 N.M. 257, 258 P.2d 371. Generally, a judge's communication with a deliberating jury is proper "so long as it leaves with the jury the discretion whether or not it should deliberate further." *State v. Laney*, 2003-NMCA-144, ¶ 52, 134 N.M. 648, 81 P.3d 591 (internal quotation marks and citation omitted). In determining whether the jury was coerced to arrive at a verdict, we consider the actions as well as the circumstances under which the actions arose. *Id.* ¶ 56.

**{9}** In this case, we are asked to measure the impact the judge's interaction with the jury had on the jury's verdict. Notwithstanding the objection of both parties, the district court felt it was appropriate to interrupt jury deliberations before the end of the work day to check on the jury's progress despite the fact that the crimes charged were grave in nature, there was a significant amount of evidence presented, and the jury had not expressed any difficulty in reaching a unanimous verdict. While it may have been nothing more than an attempt to manage its docket on a Friday afternoon, the interruption was unusual. Nonetheless, the parties have failed to provide us with citations to case law with similar facts addressing the propriety of a district court's interruption of jury deliberation without prompting from the parties, juror confusion,

8

or juror disagreement. Absent such authority, we focus our analysis on the court's interactions with, and demeanor in front of, the jury. *Laney*, 2003-NMCA-144, ¶ 56 (stating that in assessing coercion, we look to the court's actions, as well as the circumstances under which the court's actions arose).

{10}　　Our Supreme Court long ago resolved that it is within the judge's purview to inquire of the jury about the need for further jury deliberations. *State v. Rickerson*, 1981-NMSC-036, ¶ 7, 95 N.M. 666, 625 P.2d 1183 (acknowledging that inquiries are part of "the court's duty to assure that a verdict is reached"). While such inquiries are generally the result of a jury deadlock, the parties provide no case law limiting the district court's authority to inquire to circumstances in which the jury is having difficulty reaching a verdict. Unless the judge's actions somehow deprived the jury of its discretion, the judge's statements do not constitute error. While the judge's actions in this case were admittedly unusual, nothing in his statements was suggestive or coercive. The judge's questioning was limited to asking whether further deliberations would be beneficial. At no point did the district court require the jury to keep deliberating or inquire how many jurors were voting guilty or not guilty on the murder charge. *See Rickerson*, 1981-NMSC-036, ¶ 3 (acknowledging that inquiry into the numerical division of the jury may be reversible error when it is shown to have a coercive effect on the jury); *State v. Juan*, 2010-NMSC-041, ¶ 19, 148 N.M. 747, 242

P.3d 314 (concluding that the court's failure to answer a jury question "left the jury with the impermissible impression that it must continue its deliberations indefinitely" and amounted to reversible error) . The jury's discretion remained intact throughout the proceedings.

{11} Defendant's coercion argument centers on the district court's actions regarding the murder charge, namely, the district court's efforts to clarify the jury's progress regarding its not-yet-final verdict. Our Supreme Court has recognized that the district court's ability to conduct inquiries into the jury's verdict is implicit in the court's duty to assure that a verdict is reached. *Rickerson*, 1981-NMSC-036, ¶ 7. Clearly the district court's decision to take verdict forms for the remaining counts, read them into the record, and poll the jury on those counts before the jury had reached a unanimous decision on *all* counts created confusion in this case. Given the foreperson's clarification that the jury was still deliberating on the first and second degree murder charges and the additional two-and-half hours of deliberation that followed the district court's inquiry, however, we see no indication that the jury felt coerced by the judge's actions and find no due process violation. *See Laney*, 2003-NMCA-144, ¶¶ 55-57 (reasoning that the absence of a shotgun instruction, the jury's willingness to continue deliberating, and an additional two hours of deliberation demonstrated that the jury was not coerced).

**Acquittal**

{12}    Defendant also argues that the verdict form finding Defendant not guilty of voluntary manslaughter should have resulted in an acquittal on the entirety of the murder charge. The jury was instructed to individually consider each greater offense before considering a lesser offense:

> [T]he jurors first must determine whether they unanimously agree that the defendant is guilty of first-degree murder. If they agree that the defendant is guilty, the jury enters a guilty verdict for first-degree murder and does not need to consider second-degree murder or voluntary manslaughter. If not, after reasonable deliberation, the jurors must then consider second-degree murder. The jurors follow the same procedure with respect to second-degree murder and only consider voluntary manslaughter if they cannot unanimously agree that the defendant was guilty of second-degree murder.

*State v. Phillips*, 2017-NMSC-019, ¶ 4, 396 P.3d 153 (citations omitted); *See* UJI 14-250 NMRA. Defendant argues that because the jury found Defendant not guilty of voluntary manslaughter and the instruction requires consideration of voluntary manslaughter only upon finding the defendant not guilty of first and second degree murder, he should have been acquitted of the murder count in its entirety. We disagree.

{13}    Our Supreme Court made clear, in *Phillips*, that "[i]n the face of juror confusion, the district court possesse[s] significant discretion to undertake proper remedial measures to clarify the jurors' ambiguous responses." 2017-NMSC-019, ¶ 15

11

(internal quotation marks and citation omitted). While *Phillips* is factually distinguishable because it dealt with a jury that could not reach a unanimous verdict, the Court's discussion of larger concepts, including a judge's obligation to clarify ambiguities in a jury's verdict and the finality of a verdict, is helpful to our analysis here. *Id.* ¶¶ 9, 14-15, 18. The district court's poll of the *Phillips* jury created ambiguities as to whether the jury was deadlocked on the entire count or only first degree murder. Because the district court's actions in that case failed to clarify which crimes caused a deadlock, the Court remanded for retrial on voluntary manslaughter only, the lowest offense in the count, because it was unclear as to which crime the jury could not agree. *Id.* ¶ 2. In doing so, the Court acknowledged an "interesting wrinkle"—the jury had sent a note to the judge on the second day of a three-day deliberation, indicating it was hung on second degree murder. *Id.* ¶ 18. First, declining to consider the jury's note as evidence that it was hung on second degree murder, the Court reasoned that the note was "merely . . . a snapshot of the jury's thinking partway through deliberations." *Id.* A verdict must be rendered in open court and accepted by the court to become final. *Id.* The court pointed out that the results of a jury poll are "the ultimate expression of the jury's verdict at the time of its discharge[,]" and the results of a poll may even supercede any contrary verdict rendered in the jury room. *Id.*

12

{14}     This case contains a similar wrinkle. Instead of a note sent to the court, the jury gave the district court a completed voluntary manslaughter verdict prior to the end of deliberations. The resulting ambiguity was of the district court's own making. Had the district court not insisted that the jury provide the verdict forms for the offenses it had decided, and instead collected all of the verdict forms at the completion of all deliberations, there would likely be no argument regarding acquittal based on the voluntary manslaughter verdict.[1] However, the district court, after unnecessarily creating ambiguity regarding the jury's intentions on the murder count, clarified by inquiring of the foreperson, "[d]oes that mean that in finding . . . Defendant not guilty of voluntary manslaughter, you've also found him not guilty of second degree and first degree murder?" The foreman's response was succinct and unequivocal: "[t]hat is not correct. We're still deliberating." The foreperson not only clarified that the jury had not yet reached a verdict on the murder count, but also clarified that it had not intended to acquit Defendant on that count when it submitted the completed voluntary manslaughter verdict form. At the end of the district court's inquiry Friday evening, no ambiguity remained. The district court had neither accepted a verdict on the murder count in open court, nor conducted a jury poll. As such, the jury had given no final

[1]We note that Defendant does not assert the district court erred by accepting the jury's verdict as to Counts 2 through 6 prior to completion of deliberations on all counts.

13

verdict and Defendant was not entitled to acquittal. When polled the following Monday, after deliberations were concluded, the jury confirmed that it had found Defendant guilty of second degree murder.

**{15}** The unique facts of this case lead us to conclude that the jury's verdict was free from coercion. Further, nothing in the record suggests that the verdict form on the murder count submitted Friday evening represented an "ultimate expression of the jury's verdict at the time of its discharge." *See id*. As a result, we affirm the jury's final verdict convicting Defendant of second degree murder.

**Confession**

**{16}** Defendant next argues that because he qualifies as a youthful offender, he is entitled to the protections afforded by NMSA 1978, Section 32A-2-14(D) (2009), which requires the State to prove that Defendant's statements were "elicited only after a knowing, intelligent and voluntary waiver" of his constitutional rights. Defendant asserts that the State did not meet its burden in this regard. We review de novo the district court's application of the law to the facts in denying a motion to suppress inculpatory statements. *State v. Gutierrez*, 2011-NMSC-024, ¶ 7, 150 N.M. 232, 258 P.3d 1024. In making that assessment, we accept the district court's factual findings unless they are clearly erroneous, viewing the evidence in the light most favorable to the district court's ruling. *Id.*

14

{17} The Children's Code provides that no child suspected of being a delinquent child shall be interrogated or questioned without first being advised of his or her constitutional rights and giving a knowing, intelligent, and voluntary waiver of those rights. *See* § 32A-2-14(C). Before a child's statement or confession may be introduced at a trial or hearing, "the state shall prove that the statement or confession offered in evidence was elicited only after a knowing, intelligent and voluntary waiver of the child's constitutional rights was obtained." Section 32A-2-14(D). For persons older than fifteen years of age, the State's burden in this regard is by a preponderance of the evidence. *See State v. DeAngelo M.*, 2015-NMCA-019, ¶ 15, 344 P.3d 1019 (citing *Gutierrez*, 2011-NMSC-024, ¶ 7). Section 32A-2-14(E) requires that, in determining whether a waiver was knowing, intelligent, and voluntary, a court must consider the following factors:

>      (1)    the age and education of the respondent;
>
>      (2)    whether the respondent is in custody;
>
>      (3)    the manner in which the respondent was advised of the respondent's rights;
>
>      (4)    the length of questioning and circumstances under which the respondent was questioned;
>
>      (5)    the condition of the quarters where the respondent was being kept at the time of being questioned;

15

(6)     the time of day and the treatment of the respondent at the time of being questioned;

(7)     the mental and physical condition of the respondent at the time of being questioned; and

(8)     whether the respondent had the counsel of an attorney, friends or relatives at the time of being questioned.

The district court examines the totality of circumstances, "giving particular emphasis to the factors listed in the statute." *State v. Lasner*, 2000-NMSC-038, ¶ 7, 129 N.M. 806, 14 P.3d 1282 (internal quotation marks and citation omitted); *see id.* (acknowledging that the list of factors contained in Section 32A-2-14(E) is "a codification of the totality-of-the-circumstances test"); *State v. Wyatt B.*, 2015-NMCA-110, ¶ 19, 339 P.3d 165 (stating that "the applicable test for reviewing whether a child waived his or her statutory right is the same as that of an adult").

{18}     Defendant was interviewed twice: first on June 10, 2011, and then again the next day on June 11, 2011. Defendant's interview on the first day occurred in segments, in an interview room that was approximately 10' x 10', and contained a bench, two chairs, and a one-way observation window. Two officers were present throughout Defendant's interview. The first segment began at 4:21 p.m. and lasted fifty-nine minutes. The officers then took a twenty-minute break, and initiated a second interview that lasted approximately thirty minutes. After another twenty-

16

minute break, a third interview took place, which lasted approximately six to seven minutes.

{19}    At the time of the interview, Defendant was three months shy of his eighteenth birthday and had completed eleventh grade. When the interviewing officers arrived, Defendant was handcuffed and in custody, but was released from the handcuffs before the interview began. The officers provided Defendant with a standard form advising him of his rights, and he initialed the form to acknowledge that he understood. The form stated:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer, family member or friend for advice before we ask you any questions, and to have him/her present during any questioning. If you cannot afford a lawyer, one will be appointed to represent you free of charge by the court before any questioning. If you wish to answer questions now without a lawyer, family member or friend present, you have the right to stop answering questions at any time. You also have a right to stop answering questions at any time until you have talked to a lawyer, family member or friend.

There was a blank space after each sentence, in which Defendant signed his initials. Defendant also initialed to acknowledge each of the following waivers:

> I have read the statement of my rights shown above. I have also had my rights read and explained to me. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer present. I do not want a family member or friend present. I understand and know what I am doing. No promises or threats of any kind have been made to me and no pressure of any kind has been used against me.

17

{20} During the interview, Defendant appeared clean, rested, coherent, and alert. Defendant acted in a calm and polite manner toward the interviewing officers, articulating and communicating clearly. Defendant gave no indication that he was uneducated or confused by the questions being posed to him. Though Defendant's parents were present in the building at the time of the interview, Defendant was not informed of their presence; and, while his parents were not with Defendant during the interview, he was advised that he could have them present if he wanted.

{21} The next day, June 11, 2011, the officers interviewed Defendant, again doing so in the afternoon. That interview took place in a room containing a table with chairs on both sides. The officers began the interview by asking Defendant whether an attorney had been assigned to him, to which Defendant answered no. Though Defendant did not fill out an additional waiver form, the officer went over the rights from the waiver the day before and asked whether Defendant remembered that he had those rights; Defendant responded that he remembered, and he agreed to speak with the officers. Defendant was not in handcuffs for this interview. Defendant's demeanor was similar to the day before, and he was composed, cooperative, and polite. Again, the officer did not observe anything unusual in Defendant's behavior or demeanor.

{22} Prior to trial, Defendant filed a motion to suppress inculpatory statements that he gave to the police during these interviews. The State's response clarified that it was

only seeking to introduce statements Defendant made after he was adequately advised of his rights, and it included digital recordings of Defendant's interviews. The district court held a hearing on the motion, during which the State offered the testimony of the officer involved in Defendant's interviews. The State also offered evidence that Defendant previously had his rights explained to him in an unrelated matter seven months earlier. In that instance, Defendant had a similar form read and explained to him, and he signed and initialed that form, waiving his rights. There was no indication or assertion that Defendant did not understand his rights or the implications of his waiver on that occasion either.

{23} Defense counsel then called Maxann Shwartz, a licensed clinical psychologist, to testify regarding the voluntariness of Defendant's waiver. Shwartz testified that Defendant was slower to develop than his peers because he had been neglected when he was younger. She also noted that English was not Defendant's first language, and that any language difficulties Defendant had would be made worse when he was under stress. Shwartz characterized Defendant as suffering from reactive attachment disorder, which led Defendant to develop personality styles to please others; she explained that in order to avoid difficulties, Defendant would avoid asking for things and making his needs known. The best way for Defendant to have his rights explained to him, according to Shwartz, would be through a slow, piece-by-piece explanation.

Shwartz concluded that Defendant was unable to assert his rights during the June interviews. Shwartz explained that Defendant was likely unable to comprehend the significance of his decision to waive his rights because he was functioning "like a child—a seven-year-old." Shwartz also testified, however, that Defendant was "pretty bright" intellectually and that he did well in school. She agreed with the State on cross examination that, after reviewing the recordings of Defendant's statements to police, nothing in Defendant's behavior was unusual or would have indicated to the officers that he had any sort of impairment; according to Shwartz, "they would have no idea."

{24}     The district court, after considering the parties' arguments and listening to the recordings of the interviews, issued an order denying Defendant's motion to suppress his inculpatory statements. The district court found that at the time of the interview, Defendant was seventeen years old, had completed the eleventh grade, and made good grades in school. It acknowledged that Defendant was in custody during both interviews and found the officer's testimony regarding the location, conditions, and length of the interviews to be credible. Regarding the waiver of Defendant's rights, the district court found that Defendant "was properly advised of his rights immediately prior to the first interview and initialed and signed a written rights waiver." It also took note of the fact that Defendant had undergone questioning on an unrelated matter approximately six months earlier, had his rights explained to him,

20

and waived his rights in that interview as well. The district court pointed out that, though Defendant may have been suffering from a lack of sleep, there was "nothing unusual about the mental or physical condition of [D]efendant at the time of the questioning[, . . . and] he appeared clean, rested, calm, polite and articulate." The district court also found that while Defendant did not have the counsel of an attorney, friend, or relative at the time of questioning, he had spoken with his parents between the first and second interview.

{25} Having considered and made findings regarding each of the factors listed in Section 32A-2-14(E), the district court turned to case law and the testimony of Shwartz. Noting the broad implications of Defendant's argument, the district court declined to apply a rule requiring officers to "quiz the suspect to confirm an in-depth understanding of the waiver[,]" and characterized such a rule as "burdensome and onerous[.]" The district court also specifically declined to adopt Shwartz's testimony because it believed that following Shwartz's opinions would lead to the result that "no juvenile could ever validly waive *Miranda* rights." As a result, the district court concluded that the State proved by a preponderance of the evidence that Defendant's waiver was knowingly, intelligently, and voluntarily given.

{26} On appeal, rather than explicitly challenging the district court's findings, Defendant asserts that the district court should have considered Shwartz's testimony

21

regarding frontal lobe development in children and its impact on a child's ability to make a knowing and intelligent waiver in its assessment of the totality of circumstances. Defendant also does not explicitly challenge the district court's ruling on the basis that it did not consider all eight factors enumerated in Section 32A-2-14(E), instead, arguing that the district court erred in refusing to consider Shwartz's testimony that Defendant was unable to assert or comprehend his rights at the time of questioning.

**{27}** The district court was free to weigh the testimony and determine Shwartz's credibility in making its factual findings. *See State v. Gonzales*, 1997-NMSC-050, ¶ 18, 124 N.M. 171, 947 P.2d 128 ("Determining credibility and weighing evidence are tasks entrusted to [a district] court sitting as fact-finder."); *see also State v. Maes*, 1983-NMCA-073, ¶ 16, 100 N.M. 78, 665 P.2d 1169 (recognizing that the district court acts as the fact-finder in motions to suppress), *abrogated on other grounds as recognized by State v. Armijo*, 2005-NMCA-010, ¶ 28, 136 N.M. 723, 104 P.3d 1114. In weighing the evidence, the district court is free to reject even uncontroverted expert opinion. *See State v. Alberico*, 1993-NMSC-047, ¶ 36, 116 N.M. 156, 861 P.2d 192 ("[A]n expert's opinion is not conclusive of a fact in issue even though the opinion may be uncontroverted."); *State v. Mireles*, 2004-NMCA-100, ¶ 35, 136 N.M. 337, 98 P.3d 727 (acknowledging that it is "the fact-finder's prerogative" to reject expert

testimony). The district court "specifically decline[d] to adopt" Shwartz's testimony in this case, explaining that it felt Shwartz had an insufficient foundation on which to base her conclusions, having only spoken with Defendant three times and having run no tests on Defendant. Furthermore, the district court found Shwartz's conclusions unpersuasive in light of evidence regarding Defendant's behavior during two interviews and his performance during a preliminary hearing. The district court's findings in this case were supported by the evidence, and it did not err in rejecting Shwartz's testimony.

{28}     Defendant also acknowledges that the district court considered each of the eight factors listed in Section 32A-2-14(E), but complains that its consideration of those factors was nominal. We are unpersuaded. Of the eight factors, only the last one—whether Defendant had counsel of an attorney, friends or relatives at the time of questioning–weighs in Defendant's favor. That single factor is not sufficient to overcome all of the other circumstances supporting the knowing, intelligent, and voluntary waiver of his rights, including that Defendant was almost eighteen, was intelligent, was not handcuffed during the interviews, and was questioned during the afternoon for short periods of time with breaks in between in an appropriate environment while he was clean and rested, and in a coherent and alert state of mind. Furthermore, the district court also considered in its analysis of the totality of

circumstances, Defendant's demeanor during pretrial hearings and the fact that the same rights had been explained to him a few months earlier without any challenge to the validity of waiver. We agree with the district court's determination that, based on the evidence presented during the suppression hearing and the totality of circumstances, Defendant's waiver was knowing, intelligent, and voluntary.

**Sentence**

{29}	Because Defendant was a minor when the incident occurred, the district court held an amenability hearing following his conviction and prior to sentencing in accordance with NMSA 1978, § 32A-2-20(A) (2009). The district court found by clear and convincing evidence that Defendant was not amenable to treatment and not eligible for commitment to an institution for children. The district court subsequently sentenced Defendant, as an adult, to thirty-three years of incarceration, followed by two years of parole.

{30}	Defendant argues that he cannot be sentenced as an adult for the delinquency offenses; and, because he was adjudicated guilty of both delinquency offenses and youthful offender offenses, he asks that we vacate his convictions for the delinquency offenses. As support for this argument, Defendant relies on Section 32A-2-20(E), and our Supreme Court's reasoning in *State v. Jones*, 2010-NMSC-012, 148 N.M. 1, 229 P.3d 474, and *State v. Muniz*, 2003-NMSC-021, 134 N.M. 152, 74 P.3d 86,

*superceded by statute on other grounds as recognized by Jones*, 2010-NMSC-012, ¶ 19. Defendant neither challenges the district court's decision to sentence him as an adult based on his status as a youthful offender, nor asserts the district court erred in finding that he was not amenable to treatment and not eligible for commitment to an institution. "We review the [district] court's sentencing for an abuse of discretion." *State v. Montoya*, 2015-NMSC-010, ¶ 63, 345 P.3d 1056 (internal quotation marks and citation omitted).

{31}     A delinquent child is one who has committed a delinquent act, such as the unlawful taking of a motor vehicle or an offense punishable as a felony. NMSA 1978, § 32A-2-3(A), (B) (2009). A child is characterized as a youthful offender if he is a delinquent child who is fourteen to eighteen years of age when he commits at least one of thirteen offenses enumerated in the Act, including second degree murder and aggravated burglary. Section 32A-2-3(J)(1).

{32}     The district court sentenced Defendant to fifteen years incarceration for second degree murder—a lesser included offense to first degree murder charged in Count 1 of Defendant's indictment—and nine years for aggravated burglary. The remaining four felony convictions earned Defendant an additional nine years. An adjudication for second degree murder and aggravated burglary elevates a delinquent child to a youthful offender under the definitions set forth in Section 32A-2-3(J), while the

25

remaining offenses are delinquent acts under the statute. Section 32A-2-3(A). Under Section 32A-2-20(A), the district court has the discretion to sentence a youthful offender as either an adult or juvenile. "If the court invokes an adult sentence, the court may sentence the child to less than, but shall not exceed, the mandatory adult sentence." Section 32A-2-20(E).

{33} In *State v. Montano*, 1995-NMCA-065, ¶ 7, 120 N.M. 218, 900 P.2d 967, we recognized that a conviction for a delinquent act may result in an adult sentence where the defendant is also convicted and sentenced as an adult for a youthful offender offense. There, the defendant was convicted of two crimes: one that the statute enumerated as a delinquent offense, and one that the statute enumerated as a youthful offender offense. *Id.* ¶ 4. After being sentenced as an adult for both offenses, the defendant appealed, arguing that the court lacked authority to sentence him as an adult for the delinquent offense. *Id.* ¶ 5. Looking to case law, we noted that jurisdiction—both personal and subject matter—transfers from children's court to district court where a juvenile is to be prosecuted as an adult. *Id.* ¶ 7; *see also* § 32A-2-20(E) (noting that invoking an adult sentence "terminates the jurisdiction of the court over the child with respect to the delinquent acts alleged in the petition"). *Montano* emphasized that an anomaly existed in allowing both the district court and the children's court to have jurisdiction over a youthful offender so that a defendant

26

"would be subject to rehabilitation as a juvenile, while at the same time he could be sentenced to prison as an adult offender." 1995-NMCA-065, ¶ 5 (internal quotation marks and citation omitted). Though acknowledging the "theoretical possibilities" of a dual sentencing scheme where a court could sentence someone both as an adult and as a juvenile, *Montano* ultimately rejected such a scheme, reasoning that it "fail[s] to address the anomaly of sentencing a defendant to be rehabilitated as a juvenile when there has been a determination that the defendant cannot be rehabilitated in available juvenile facilities." *Id.* ¶ 6. We then looked to the statute, noting our obligation to avoid unreasonable interpretations and applications of its language. Seeing no ambiguity in the statute's language that would warrant an in-depth analysis of that language, we concluded that, "[b]ased on the statutory scheme and caselaw concerning the transfer of juveniles to district court," the Legislature intended any juvenile adjudicated for a youthful offender offense "to be subject to adult sanctions under Section 32A-2-20 for *any offense* in the same case." *Montano*, 1995-NMCA-065, ¶ 7 (emphasis in original). As a result, we affirmed the defendant's adult sentence for an offense enumerated as a delinquent act under the statute.

{34} *Montano* guides our analysis in this instance. Though *Montano* dealt with a previous version of this statute, the relevant language remains the same. Defendant's convictions for second degree murder and aggravated burglary are clearly youthful

27

offender offenses under the statute. *See* § 32A-2-3. The statute provides the district court with discretion to sentence Defendant as an adult. *See* § 32A-2-20(A). Indeed, Defendant neither argues that he was improperly sentenced as an adult for the second degree murder and aggravated burglary charges, nor asserts that he was improperly characterized as a youthful offender. According to *Montano*, if the district court properly sentenced Defendant as an adult for the youthful offender offenses, then it could properly sentence Defendant as an adult for the remaining offenses. By acknowledging the propriety of his sentence for the youthful offender counts, Defendant has failed to demonstrate the district court erred in sentencing him as an adult for the remaining delinquency counts.

{35} To the extent that Defendant cites to *Muniz* and *Jones*, as support for his position, we are unpersuaded. *Muniz* and *Jones* are distinguishable, as they dealt with the district court's authority to impose an adult sentence based on a serious youthful offender charge that had been dropped—either as a result of plea negotiations or the prosecutor's discretion. *See* § 32A-2-3(H) (defining "serious youthful offender" as "an individual fifteen to eighteen years of age who is charged with and indicted . . . for first degree murder"). In addition, the Legislature "largely abrogated" *Muniz* by amending Section 32A-2-20 in 2005, while *Jones* focused on whether an amenability

28

hearing was required under Section 32A-2-20(B). *See Jones*, 2010-NMSC-012, ¶¶ 19, 23-48.

**CONCLUSION**

{36}    Defendant has failed to demonstrate error in the proceedings below. We therefore affirm Defendant's conviction and sentence.

{37}    **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Chief Judge**

_____
**STEPHEN G. FRENCH, Judge**